Opinion issued August 28, 2018



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00017-CV

————————————

## IN THE MATTER OF A. M.

———————————————————————

**On Appeal from the County Court at Law No. 1
Fort Bend County, Texas
Trial Court Case No. 12-CJV-017003**

———————————————————————

## MEMORANDUM OPINION ON REHEARING[1]

This case involves the interpretation and application of a statute concerning

the transfer of minors to criminal district court to be tried as adults. The statute has

---

[1] We issued our original memorandum opinion in this case on June 28, 2018. The State filed a motion for en banc reconsideration. We withdraw our previous opinion and issue this opinion in its stead. The disposition remains the same. The State's motion is moot given this issuance.

been amended, but the disposition of this appeal must be resolved under the earlier version of the statute.

When Andy Morrison (a pseudonym) was a minor, he was indicted for murder. In June 2012, after Andy had turned 18, the juvenile court heard and granted the State's petition for discretionary transfer from juvenile court to criminal district court. The case was transferred, and Andy was tried as an adult, convicted of murder, and sentenced to 45 years' confinement.

Our sister court subsequently vacated the criminal district court's judgment because the juvenile court did not make the requisite findings under Section 54.02(j) of the Family Code. *Morrison v. State*, 503 S.W.3d 724, 725, 728 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Relying on a recently-issued opinion by the Court of Criminal Appeals, our sister court explained that when a transfer occurs after a juvenile's 18th birthday, Section 54.02(j)(4) requires the State to prove that it was not practicable to proceed to certification before the juvenile's 18th birthday. *Id.* at 727 (citing *Moore v. State*, No. PD-1634-14, 2016 WL 6091386 (Tex. Crim. App. Oct. 19, 2016)).[2] At the June 2012 transfer hearing, the State presented no evidence that it was not practicable to proceed before Andy turned 18. The State instead argued that Section 54.02(j) required only that the

---

[2] The Court of Criminal Appeals withdrew the opinion cited by our sister court and issued a new opinion in its stead. *Moore v. State*, 532 S.W.3d 400, 401 (Tex. Crim. App. 2017) (per curiam). The new opinion, however, did not change the rule on which our sister court relied. *Id.* at 405.

transfer petition be filed—but not ruled on—before Andy turned 18. Our sister court rejected this argument, remanded the case to the juvenile court to afford the State an opportunity to satisfy its burden of proof, and ordered that the juvenile court file findings of fact in support of its ruling. *Morrison*, 503 S.W.3d at 728.

On remand, the State filed an amended petition, and the juvenile court held a hearing at which the State presented testimony from the lead investigator, firearms examiner, and probation officer, among others. However, none of the district attorneys involved in the investigation or prosecution testified. The juvenile court found that the State proved by a preponderance of the evidence that, for reasons beyond its control, it was not practicable to proceed in the juvenile court before Andy's 18th birthday. The juvenile court entered 50 fact findings detailing the murder investigation's chronology, Andy's arrest, and the transfer proceedings. None of the fact findings addressed whether it was practicable for the State to take certain actions during various stages of its investigation to expedite the transfer hearing or whether the State's failure to take such actions was caused by the prosecutor's erroneous interpretation of Section 54.02(j). Instead, the juvenile court simply stated in a conclusion of law that it was not practicable for the State to have proceeded before Andy's 18th birthday.

In a single issue, Andy argues that the juvenile court erred in waiving its jurisdiction because the State failed to prove by a preponderance of the evidence

that, for a reason beyond the State's control, it was not practicable to proceed to certification before Andy turned 18. *See* TEX. FAM. CODE §§ 54.02(j)(4)(A), 56.01(c)(1)(A); TEX. PENAL CODE § 19.02(b).

After Andy's 18th birthday, the Legislature amended the statute governing a juvenile court's jurisdiction over incomplete proceedings. Acts 2013, 83rd Leg., ch. 1299 (H.B. 2862), § 7, eff. Sept. 1, 2013. Under the current statutory scheme, when the State files a petition to transfer before the juvenile turns 18, the juvenile court retains jurisdiction to rule on the petition after the juvenile turns 18 so long as the juvenile court finds that the *prosecutor* exercised due diligence in an attempt to complete the transfer proceeding before the juvenile's 18th birthday. TEX. FAM. CODE § 51.0412. But under the scheme in effect at the time of June 2012 transfer hearing—which is the version that applies to this appeal—the juvenile court had to find that it was not practicable to proceed before Andy's 18th birthday for a reason beyond the control of *the State* for the juvenile court to retain jurisdiction. *Id.* § 54.02(j)(4)(A).[3] The former scheme imposes a higher burden on the State because the delay must be for a reason beyond the State's control and because "the State" includes not only the prosecution but law enforcement as well.

---

[3]     It is undisputed that Section 54.02(j)(4)(B) of the Family Code does not apply here. *See* TEX. FAM. CODE § 54.02(j)(4)(B).

Bound by the earlier version of the statute, we consider the evidence of impracticability for reasons beyond the State's control. The evidence demonstrates a lack of urgency at several points during the criminal investigation and while the State petitioned for transfer. To begin, no one expedited the firearms analysis, and the State waited for that analysis before proceeding against Andy. While Andy was charged and apprehended approximately 8 weeks before his 18th birthday, there is no evidence that the prosecutor attempted to expedite the transfer hearing after his arrest. Nor is there any evidence that the juvenile court was unable to hear the petition before Andy's 18th birthday. Andy's psychological evaluation and social home study report, both of which were needed for the transfer hearing, were not completed until after Andy turned 18—but the evidence shows that both reports could have been completed earlier had the State not delayed in providing the psychiatrist and juvenile probation officer the necessary information for the reports. In other words, the evidence shows that it was practicable to proceed before Andy's 18th birthday. But, as shown by the prosecutor's statements during the June 2012 transfer hearing, before *Moore v. State* was decided, the prosecutor believed it was necessary only to file—but not resolve—the transfer motion before the defendant turned 18. *Moore* held otherwise, and we are bound by that ruling. 532 S.W.3d 400, 405 (Tex. Crim. App. 2017).

We hold that the State failed to prove that it was not practicable to proceed before Andy's 18th birthday for a reason beyond the State's control and that the juvenile court erred in transferring the case. Accordingly, we must vacate the juvenile court's order and dismiss the case.

## Background

On August 26, 2010, the complainant, seventeen-year-old Kristian Sullivan, who was a member of the gang "Forever About Bread," was shot and killed outside his home in a gang-related shooting. No weapons were found at the scene, and no eye-witnesses came forward. Two different brands of casings were found, but they were of the same caliber. The police suspected, but were not sure, that there were two gunmen. At the time of Sullivan's murder, Andy was sixteen years and five months old.

Before Sullivan's death, there had been "numerous, numerous crimes, shooting, fights, that were going on" between feuding gang members. While police were still on the scene of Sullivan's murder, another shooting occurred at the home of a rival "100 Clikk" gang member. The shooting appeared to be in retaliation for Sullivan's murder.

The lack of evidence and the reticence of gang members to speak with the police made the investigation difficult. Sullivan, known as "K-Su," was "very involved" in the leadership of FAB. Sullivan's residence was typically where FAB

gang members would "hang out." Sullivan's friends were not cooperative with the police; there was testimony that "traditionally gang members don't just come to police with information." Police had multiple names, but researching those names, and generating and corroborating information, took substantial time. Missouri City Police Sgt. K. Tullos testified that any member of 100 Clikk "would be a possible suspect at the time." Around the time of Sullivan's murder, 100 Clikk had about 300 members.

Andy's name was first mentioned on December 6, 2010 by a senior member of 100 Clikk, Michael Wilbourn, who was then in federal custody for aggravated robbery. Wilbourn identified "Tony T" as a person who wanted to sell him "a gun used to kill ole boy." Missouri City Police Lt. R. Terry testified that Wilbourn did not implicate himself in the murder and was not credible. At that point, there was nothing to corroborate Wilbourn's statement, but Lt. Terry "still [had] to follow up on his statement just to verify."

Lt. Terry testified that he learned that Tony T's real name was Anthony Andy. Andy was a student at Marshall High School, and he lived just outside Missouri City. Lt. Terry went to Andy's address, but he found a vacant house. Lt. Terry later learned that Andy was in juvenile detention in Fort Bend County, but he did not speak with Andy. Lt. Terry then learned that Andy had been released from juvenile detention on December 8, 2010. Lt. Terry admitted that he did not attempt

to locate Andy, in part, because he did not believe he could get information about a juvenile on probation.

Lt. Terry testified that, as of December 7, 2010, he did not have an identified suspect. Rather, he had street names for multiple individuals, nothing to corroborate their involvement, and a lack of cooperation from their associates. Lt. Terry looked to the Special Crimes Unit, who were "more involved in dealing with gang members and street activity" and who were talking to gang members during "gang sweeps."

From December 2010 to June 2011, the SCU worked to document gang members and generate leads in Sullivan's murder. The SCU was "busy"—over 100 gang members were documented and entered into the DPS database during this time, and a lot of information was coming in.

On June 3, 2011, Lt. Terry was promoted, and the Missouri City Police Chief turned the investigation over to SCU Sgt. R. Ramirez. Around that same time, Sgt. Ramirez spoke to 100 Clikk member Darius Pye, "a respected high ranking gang member," who implicated a fellow gang member, Sterlyn Edwards, in the murder. Pye said that he was in a car driven by Edwards, who was talking on the phone to a rival FAB gang member. According to Pye, Edwards told the rival gang member, "I'll bang, bang you like I bang, bang K-Su." This was the first break in the case, but the information still needed to be corroborated.

8

Sgt. Ramirez testified that on August 18, 2011, he met with Donald Reed, a member of 100 Clikk, who said that Darius Downer, another member of 100 Clikk, told him that Edwards had shot Sullivan. Sgt. Ramirez spoke with Downer, who said that Edwards had tried to sell him a gun after Sullivan's murder. Downer was the second 100 Clikk member to implicate Edwards, a fellow 100 Clikk member, and Sgt. Ramirez thought this information was credible.

Sgt. Ramirez learned that a week before Sullivan's murder, someone named "Rene" was shot at Downer's house by FAB gang members. Sgt. Ramirez met with Rene, who was still recovering from his gunshot wound. Rene said that he was not a gang member but that he liked to play basketball with 100 Clikk members and that one of his best friends was Andy. This information that one of Andy's best friends had been shot by FAB gang members provided the officers with a possible motive for Sullivan's murder.

Sgt. Ramirez testified that on August 23, 2011, he went to speak with Wilbourn. Since his December 2010 interview, Wilbourn had been convicted of bank robbery and was currently serving a 15-year prison sentence. Wilbourn implicated 100 Clikk in Sullivan's murder. Wilbourn told Sgt. Ramirez that Edwards had implicated himself in the murder of Sullivan and that Andy had tried to sell him a gun. Wilbourn said that Edwards and Andy had "borrowed a Ford Taurus from some girls" and that they drove that car to commit the murder.

The next week, Sgt. Ramirez interviewed FAB gang member Allen Henderson. Henderson said that, during a "heated phone conversation" with Edwards, Edwards threatened to "bang, bang" him "just like he bang, bang K-Su." Sgt. Ramirez testified that this matched the conversation that Pye told him in June that he had overheard. Henderson gave no information about Andy.

On October 11, 2011, Sgt. Ramirez interviewed Edwards for the first time. During the interview, Edwards implicated himself and two other gang members—Andy and Joshua Patterson—in Sullivan's murder. Edwards said that he had become friendly with Sullivan, even though they were in rival gangs. Edwards arranged for Patterson and Andy to buy marijuana from Sullivan. According to Sgt. Ramirez, Edwards said that Andy, Patterson, and he were hanging out with two girls, Samone Williams and Kandice Hall, and that after Edwards set up the marijuana deal, Hall drove Patterson and Andy to Sullivan's house, where they committed the murder. Sgt. Ramirez testified that this was the first time that he actually considered Andy to be a suspect in Sullivan's murder.

On October 14, 2011, Sgt. Ramirez spoke with Samone Williams. Williams stated that she used to own a tan or pewter Ford Taurus, which matched the description provided by Wilbourn in the August 2011 interview. On the night that Sullivan was killed, Williams was hanging out at Andy's house with Andy, Patterson, and Hall, among others. Williams said that Hall, Patterson, and Andy

10

left the house in her car but that she knew something was going on so she stayed back and went to her boyfriend's house down the street. When Hall, Patterson, and Andy returned, Edwards was with them. Later that night, Williams and Hall dropped off Andy, then they dropped off Edwards, and finally they dropped off Patterson. When they arrived at Patterson's house, Patterson put a gun in the hood of the car, and Hall told Williams that the gun was used to "kill that boy."

On October 15, 2011, Sgt. Ramirez interviewed Kandice Hall, who corroborated Williams's statement. Hall said that, on the night of the shooting, they were at Andy's house, and Andy and the other gang members were talking about something in gang language or jail code, which she did not understand. Hall went on the marijuana run with the three men, with Patterson driving the car and Edwards and Andy riding as passengers. When they arrived at Sullivan's house to buy the marijuana, Edwards and Andy got out of the car. Then she heard several gunshots, and Edwards and Andy came running back to the car. Edwards told them to "go, go, go" and indicated that he had shot someone.

Sgt. Ramirez considered the information given by Williams and Hall credible. However, neither of them saw Andy shoot Sullivan or saw him hold a gun. The use of two different brands of ammunition to shoot Sullivan indicated there may have been two shooters.

After speaking with Williams and Hall, Sgt. Ramirez believed all three men were involved in the murder, at least as parties to the offense. But Sgt. Ramirez did not believe the police were ready to request warrants for arrests. He testified that he still needed to speak with Patterson, who he believed acted as the getaway driver.

On October 25, 2011, Sgt. Ramirez met with Patterson at the police department. Patterson gave a statement that corroborated the statements of Williams and Hall. Two Fort Bend County Assistant District Attorneys were present when Patterson gave his statement. Patterson admitted to driving the car to buy some marijuana and to concealing a gun in the car's battery compartment after Edwards handed him the gun following the shooting. Patterson stated that, when they arrived at their destination, Edwards and Andy got out of the car, shots were fired, and then Edwards and Andy came running back. Edwards told Patterson to "go, go, go" while Andy "was just real quiet and mellow." Patterson's statements were consistent with there being two shooters.

That same day, Sgt. Ramirez obtained an arrest warrant for Patterson. Sgt. Ramirez explained that because both Edwards and Andy were already imprisoned, he was not concerned with getting warrants for their arrest in this case. Patterson was the only person who participated in the murder and had access to potentially hurt the girls. Also, at that point, Sgt. Ramirez was concerned that he

12

had no physical evidence to corroborate Andy's involvement. Sgt. Ramirez was waiting on laboratory results regarding DNA testing on the shell casings and firearms examinations. Sgt. Ramirez did not request that the evidence be analyzed on an expedited basis, and there is no evidence that anyone else did either. Sgt. Ramirez admitted that he did not see the need to rush the examination. At this time, Ramirez did not know that a timeline existed to prosecute Andy based on his status as a juvenile.

On October 26, 2011, officers located Williams's Taurus that 4 witnesses—Wilbourn, Williams, Hall, and Patterson—said was used in the murder. The Taurus had been repossessed and resold, but it was recovered and processed for blood evidence and anything related to the murder. Nothing was found in the Taurus.

On October 31, 2011, five months before Andy's 18th birthday, Sgt. Ramirez sent the whole case to the District Attorney's Office and included a request for Andy's arrest.

On November 3, the firearms examiner, Jennifer Turner, began a firearms analysis of the casings evidence. The next day, Turner completed her analysis and reached a preliminary opinion that two guns had been used in the murder. A required "technical review" of Turner's preliminary opinion was completed on November 17, 2011. At that point, Turner could have released the verbal results.

Sgt. Ramirez was unaware that the firearms testing was completed and that he could obtain an oral report of the results.

On January 27, Turner's report underwent a required final, "administrative review" for "grammatical errors and completeness." That same day, Sgt. Ramirez received a verbal confirmation from the firearms lab that two guns were used in the murder. Sgt. Ramirez testified that this was the first physical evidence to indicate that there were two shooters. Sgt. Ramirez then obtained a directive to apprehend Andy. *See* TEX. FAM. CODE § 52.015(a) ("On the request of a law-enforcement or probation officer, a juvenile court may issue a directive to apprehend a child if the court finds there is probable cause to take the child into custody under the provisions of this title."). Three days later, and two months before Andy's 18th birthday, the directive to apprehend was executed, and Andy was taken to Fort Bend County Juvenile Detention. The next day, the juvenile court held an initial detention hearing and made a finding of probable cause.

On February 13, 2012, six weeks before Andy's 18th birthday, the State filed its petition for a discretionary transfer to criminal district court under Section 54.02 of the Family Code.

On February 22, 2012, the juvenile court ordered a psychological evaluation of Andy. *See id.* § 54.02(d) ("Prior to the hearing [on the petition for transfer], the juvenile court shall order and obtain a complete diagnostic study, social evaluation,

14

and full investigation of the child, his circumstances, and the circumstances of the alleged offense."). The juvenile court appointed Dr. Karen Gollaher to conduct the evaluation, but information she needed for her evaluation was not sent to her by the Fort Bend County Juvenile Probation Department for more than a month.

Due to Andy's impending 18th birthday, on March 26, 2012, the State requested and the juvenile court signed an order that Andy be transferred from Fort Bend County Juvenile Detention to Fort Bend County Jail, as the former does not house adults. The next day, the Probation Department's Psychology Division forwarded Gollaher the information she needed for her psychological evaluation.

On March 30, 2012, Andy turned 18.

On April 5, 2012, Dr. Gollaher performed her psychological evaluation of Andy. She completed her report later that month, and the juvenile court released the report to all parties.

On June 8, 2012, Andy's assigned juvenile probation officer, Heather Boswell, completed her social home study report, which could not be completed before receipt of the psychological evaluation.

On June 12, 2012, the juvenile court held a hearing on the State's petition to transfer. The prosecutor described the hearing as "a traditional discretionary transfer hearing." The prosecutor observed that Andy had turned 18 on March 30 but the State filed its petition for discretionary transfer when Andy was 17 years

old. The prosecutor argued (without knowledge of what the later *Moore v. State* opinion would hold) that the juvenile court's decision whether to transfer the case was governed by Section 54.02(a), not Section 54.02(j), because Section 54.02(j) only applies when the State files its petition to transfer after the defendant's 18th birthday. *See Morrison*, 503 S.W.3d at 728 (citing *Moore* and explaining that Section 54.02(j) applies when transfer occurs after defendants turns 18). According to the prosecutor, because the petition was filed "well before" Andy's 18th birthday, Section 54.02(j) was "never triggered."

On June 13, 2012, the juvenile court granted the State's petition, waived its jurisdiction, and transferred the case to the criminal district court. The case proceeded to trial by jury in criminal district court. The jury found Andy guilty of Sullivan's murder, and the criminal district court sentenced him to 45 years' confinement.

Andy appealed, and the case was assigned to our sister court, which vacated the criminal district court's judgment and remanded the case to the juvenile court, holding that the juvenile court did not make the requisite statutory findings to waive its jurisdiction and transfer the case. *Id.* at 725, 728. Our sister court held that, because the juvenile court heard and ruled on the State's petition for discretionary transfer after Andy had turned 18, the State was required to prove, and the juvenile court was required to find, that the factors under Section 54.02(j)

16

had been satisfied. *Id.* at 727–28. And because the State and juvenile court failed to do so, transfer was improper. *Id.* at 728. The State filed a petition for discretionary review, which the Court of Criminal Appeals denied, and the case was remanded to the juvenile court.

On December 12, 2017, the State filed a second amended petition for discretionary transfer. Shortly thereafter, the juvenile court signed and entered an order that waived its jurisdiction over Andy and transferred the case to criminal district court under Section 54.02(j). In its order, the juvenile court found that, for reasons beyond the State's control, it was not practicable to proceed in juvenile court before Andy's 18th birthday. Andy appeals.

## Juvenile Court's Waiver of Jurisdiction

Andy argues that the juvenile court erred in waiving its jurisdiction and transferring the case to criminal district court because the State failed to show that, for a reason beyond its control, it was not practicable to proceed in juvenile court before his 18th birthday.

### A.    Standard of review and applicable law

We review a juvenile court's decision to transfer a case to a criminal district court for an abuse of discretion. *Moore v. State*, 446 S.W.3d 47, 50 (Tex. App.—Houston [1st Dist.] 2014), *aff'd*, 532 S.W.3d 400 (Tex. Crim. App. 2017). In

applying this standard, we defer to the juvenile court's factual determinations while reviewing its legal determinations de novo. *Id.*

A juvenile court has exclusive original jurisdiction over all proceedings involving a person who has engaged in delinquent conduct as a result of acts committed before age 17. *Id.*; *see* TEX. FAM. CODE §§ 51.02(2), 51.04. Section 54.02 of the Family Code governs the waiver of a juvenile court's exclusive original jurisdiction and transfer to the appropriate criminal district court. TEX. FAM. CODE § 54.02. Before conducting the transfer hearing, the juvenile court must order and obtain a complete diagnostic study, social evaluation, and full investigation of the minor, his circumstances, and the circumstances of the alleged offense. *Id.* § 54.02(d); *see In re D.L.N.*, 930 S.W.2d 253, 255 (Tex. App.— Houston [14th Dist.] 1996, no pet.). The hearing's purpose is not to determine guilt or innocence but to establish whether the best interests of the minor and society are furthered by maintaining jurisdiction in the juvenile court or by transferring the minor to district court for adult proceedings. *In re D.L.N.*, 930 S.W.2d at 255. The juvenile court determines whether there is probable cause to believe that the minor committed the offense alleged, and whether, because of the seriousness of the offense or the minor's background, the welfare of the community requires criminal proceedings. *Id.*

When a juvenile turns 18, a juvenile court does not lose jurisdiction, but its jurisdiction becomes limited. *Moore*, 532 S.W.3d at 404–05. The juvenile court retains limited jurisdiction to either transfer the case to an appropriate court or dismiss the case. *Id.* Under the statutory scheme in effect when Andy turned 18, which we are bound to apply here, these were the only two choices available to the juvenile court when it heard the State's petition 10 weeks after Andy's 18th birthday: dismiss the case or conclude that the State proved that it was not practicable for the State to have proceeded—that is, to have obtained a ruling on its petition to transfer—before Andy's birthday. The statutory limitations were intended "to limit the prosecution of an adult for an act he committed as a juvenile if his case could reasonably have been dealt with when he was still a juvenile." *Id.* at 405.

Under that statutory scheme, the juvenile court could transfer a case after a juvenile turned 18 only if the State satisfied the requirements listed in Section 54.02(j) of the Family Code. TEX. FAM. CODE § 54.02(j). Under Section 54.02(j)(4), the juvenile court could transfer the case to criminal district court if, in addition to the other statutory requirements, the State proved by a preponderance of the evidence that:

> (A)  for a reason beyond the control of the state it was not practicable to proceed in juvenile court before the 18th birthday of the [defendant]; or

19

(B)     after due diligence of the state it was not practicable to proceed in juvenile court before the 18th birthday of the [defendant] because:

    (i)     the state did not have probable cause to proceed in juvenile court and new evidence has been found since the 18th birthday of the person;

    (ii)    the person could not be found; or

    (iii)   a previous transfer order was reversed by an appellate court or set aside by a district court . . . .

TEX. FAM. CODE § 54.02(j)(4); *see Moore*, 532 S.W.3d at 405 (burden is on State to show "it was not practicable to proceed in juvenile court").

The State argued, and the juvenile court found, that transfer was proper under subsection (A). The State made no argument, and the juvenile court made no finding, based on subsection (B), and it is undisputed that subsection (B) does not apply. Thus, the issue is whether the State met its burden under subsection (A)—whether the State proved by a preponderance of the evidence that, for a reason beyond its control, it was not "practicable" to proceed in juvenile court before Andy's 18th birthday.

The statute does not define the term "practicable." When, as here, "a statutory term is undefined," we construe the term according to its "plain meaning as commonly understood at the time of enactment." *Thompson v. Tex. Dep't of Licensing & Regulation*, 455 S.W.3d 569, 570 (Tex. 2014) (per curiam); *see Chamul v. Amerisure Mut. Ins. Co.*, 486 S.W.3d 116, 125 (Tex. App.—Houston

20

[1st Dist.] 2016, pet. denied) ("In the absence of a specific amendment, a statute should be given the meaning which it had when enacted." (quoting *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n of City of Lubbock*, 616 S.W.2d 187, 189 (Tex. 1981)). And if the undefined term had "multiple common meanings," we "apply the definition most consistent with the context of the statutory scheme." *Thompson*, 455 S.W.3d at 571.

To discern the plain meaning of an undefined statutory term, we commonly refer to dictionaries. *Chamul*, 486 S.W.3d at 125 ("It is appropriate to reference a dictionary to discern the common, ordinary meaning of a statutory term that has been left undefined."). Because dictionaries "tend to lag behind linguistic realities," the best type of dictionary for discerning the plain meaning of an undefined statutory term is a dictionary published sometime after the enactment of the statute. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 419 (2012).

The statutory provision at issue here was enacted in 1995. Act of May 31, 1995, 74th Leg., R.S., ch. 262, § 34. Thus, in discerning the plain meaning of the term "practicable," we will refer to dictionaries published after the statute's enactment in 1995. The seventh edition of *Black's Law Dictionary*, published in 1999, defines "practicable" as "reasonably capable of being accomplished; feasible." *Practicable*, BLACK'S LAW DICTIONARY (7th ed. 1999). The eighth and

21

ninth editions, published in 2004 and 2009, retain this exact definition. *Id.* (8th ed. 2004); *id.* (9th ed. 2009). Similarly, the eleventh edition of *Merriam-Webster's Collegiate Dictionary*, the only edition of this dictionary published since 1995, defines "practicable" as "capable of being put into practice or of being done or accomplished: feasible." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 974 (11th ed. 2003); *see* SHORTER OXFORD ENGLISH DICTIONARY 2310 (6th ed. 2007) (defining "practicable" as "[a]ble to be put into practice; able to be effected, accomplished, or done; feasible"). Thus, as used here, the term "practicable" means something like "reasonably achievable" or "feasible."

**B.**  **Whether the juvenile court abused its discretion in finding that the State satisfied its burden under Section 54.02(j)(4)(A)**

To determine whether juvenile court abused its discretion in granting the State's petition, we must determine whether the State proved by a preponderance of the evidence that, for a reason beyond its control, it was not practicable—i.e., reasonably achievable, feasible—to proceed to certification before Andy's 18th birthday.

**1.**  **Initial investigative delay in developing Andy as a suspect**

The State presented evidence that, for reasons beyond its control, Andy was not developed as a suspect until he was seventeen years and seven months old. Although the murder occurred when Andy was sixteen years and five months old, numerous difficulties delayed developing Andy as a suspect. For example, there

22

were no eye-witnesses and no physical evidence at the crime scene. The principal witnesses, most of whom were gang members and their associates, were generally reticent to speak with the police and often uncooperative. The State contends that the lack of evidence and the reticence of gang members to talk to law enforcement are reasons beyond its control. We agree that this initial investigative delay in developing Andy as a suspect was beyond the State's control. We disagree, however, with the State's contention that a satisfactory explanation for this delay proves that the State met its burden for the entire period under review.

According to the State, because Section 54.02(j) requires only "one reason" why it was not practicable to proceed, and because the delay in developing Andy as a suspect was beyond the State's control, it necessarily follows that the State has met its burden. The State is incorrect. Suppose the murder had occurred when Andy was 14, but the State—for reasons beyond its control—did not develop Andy as a suspect until his 17th birthday. In that case, the initial investigative delay would not make it impracticable to proceed to certification before Andy's 18th birthday. In determining whether the State met its burden, the issue is not simply whether the State has shown a delay that was beyond the State's control; rather, the issue is whether the State has shown a delay that was beyond the State's control *and* made is not practicable to proceed before Andy turned 18. TEX. FAM. CODE § 54.02(j)(4)(A).

23

Although the investigative delay in developing Andy as a suspect was beyond the State's control, that delay was not "a reason" that made it "not practicable to proceed in juvenile court" before Andy turned 18. *Id.* Once law enforcement identified Andy as a suspect and determined that there was sufficient evidence to arrest him, the State had five months to file the transfer petition, set it for hearing, and obtain a ruling. But there were additional delays in both the investigation and the prosecution. The State failed to present evidence showing that these delays were beyond its control so that it was not practicable—i.e., reasonably achievable, feasible—to proceed to certification until after Andy turned 18 on March 30, 2012.

## 2. Subsequent investigative and prosecutorial delays

Once the police not only identified Andy as a suspect but also determined that there was sufficient evidence to arrest him, there were additional delays in critical parts of both the investigation and prosecution that were necessary before the trial court could conduct a hearing on the State's transfer petition. The State failed to present evidence showing that these delays were beyond its control so that it was not practicable—i.e., reasonably achievable, feasible—to proceed to certification until after Andy turned 18 on March 30, 2012.

There was a three month delay in the issuance and execution of the directive to apprehend Andy. The juvenile court's factual findings do not address the cause

24

of this delay. Nor did the State present any evidence to satisfy its burden to show that this delay was for reasons beyond its control. To the contrary, the testimony of the State's own witnesses showed that this delay was caused by the State and that it would have been practicable to issue and execute the directive to apprehend at an earlier date.

Sgt. Ramirez provided the District Attorney's Office with a police report requesting a warrant for Andy's arrest on October 31, 2011—five months before Andy's birthday. But Sgt. Ramirez did not sign a probable cause affidavit for a directive to apprehend until January 27, 2012, when he received the results of the firearms analysis confirming that two different guns were used in the murder.

The State had the burden to explain this delay. The only explanation the State offered was Sgt. Ramirez's testimony that the firearms analysis was the first physical evidence to indicate that there were two shooters and that, before receiving the results of the firearms analysis, he did not believe he had probable cause to arrest Andy in the absence of any eyewitness who had seen Andy with a gun.[4]

As factfinder, the juvenile court could have accepted Sgt. Ramirez's explanation—despite his police report requesting Andy's arrest on October 31. But that explanation does not show that the delay in arresting Andy was for a reason

---

[4] The only suspect who had been observed with a gun was Edwards.

beyond the State's control or that it would not have been practicable to arrest him earlier than January 30. Ramirez did not ask for the firearms analysis to be expedited, nor did he follow-up to obtain an oral report on the results. The firearms examiner, Jennifer Turner, testified that she could have verbally released the results of the analysis as early as November 17—over four months before Andy's 18th birthday and over two months before Andy's arrest. Turner completed her analysis on November 4, and her department completed a "technical review" of her report on November 17. Later, on January 27, her report underwent a limited "administrative review" for "grammatical errors and completeness" before its official release. The State did not offer evidence that anything prevented Turner from releasing the results after the technical review. On this record, the investigators and prosecutors simply failed to request that she do so. Nor did the State offer any evidence that the prosecutors requested an expedited firearms analysis. And there is no evidence that the investigators or prosecutors requested that the results of the analysis be orally released after the technical review.

Even with the delays during the final stages of the criminal investigation, once Andy was arrested, the State had two months to obtain a ruling on its transfer petition. Andy was apprehended on January 30; the juvenile court held an initial detention hearing on February 1; and the State filed its petition for discretionary transfer on February 13—roughly six weeks before Andy's 18th birthday. But the

State did not set the transfer hearing until June 12—over two months after Andy's birthday.

The State emphasizes that the juvenile court could not hear the petition until it "order[ed] and obtain[ed]" a diagnostic study, social evaluation, and investigation of Andy's background. *See id.* § 54.02(d). There is no evidence, however, that the State attempted to expedite any of these steps. There is no evidence that it would have been impracticable to attempt to complete these steps before Andy's birthday. And there *is* evidence of the opposite—that the diagnostic study, social evaluation, and investigation could have been completed before Andy's birthday had the State simply asked. Thus, it was a matter within the State's control and practicably achievable.

Dr. Gollaher completed her psychological evaluation and report in about a month once the information was provided to her. Kyle Dobbs, head of the Fort Bend County Juvenile Probation Department, testified that the Probation Department has "a close working relationship" with Gollaher and that it is "not hard to get her stuff." Dobbs further testified that, although there was "nothing in the record" indicating that Gollaher was asked to "prioritize" Andy's evaluation, such a request would have been "absolutely" "appropriate" under these circumstances. He likewise testified that the social home study report is "not a long

process typically" and "not hard to complete" once you have the required information.

At the June 12 transfer hearing, the prosecutor did not show—or even argue—that the requirements of Section 54.02(j)(4) had been satisfied. Instead, the prosecutor argued that the State was not required to satisfy that section's requirements because the petition had been filed before Andy's 18th birthday. The prosecutor's mistaken belief that the State was not required to satisfy the requirements of Section 54.02(j) indicates that the State did not proceed to certification before Andy's 18th birthday because the prosecutors did not think they had to do so.

### 3. The State's failure to meet its burden

In sum, the uncontradicted evidence shows that the State could have prepared the probable cause affidavit as early as November 17 and that the delay in waiting until January 27 to arrest Andy and begin taking the necessary steps for the transfer hearing was not beyond the State's control. The uncontradicted evidence further shows that, even after the delays in the final stages of the investigation, the prosecutors could have requested that the Probation Department expedite the diagnostic study, social evaluation, and investigation of Andy's background so that the juvenile court could have heard and ruled on the State's petition before Andy's

18th birthday. Thus, these additional prosecutorial delays were not beyond the State's control.

In its appellate briefing, the State offers a number of reasons for the delays, especially the prosecutorial delays: the prosecutor's understanding of the statute was based on "common sense"; the prosecutor had a duty to "not simply rush to file charges"; the prosecutor did not appoint or control the psychological expert; and so on. But the State did not present evidence in the trial court to support any of these reasons. There may have been good reasons for the prosecutorial delays—but there is no evidence of such reasons because the prosecutors did not present any at either transfer hearing.

The State complains that we have subjected the conduct of the investigators and prosecutors to an overly-critical review—one that separately analyzes and second-guesses each and every act and omission. We recognize the State's concern, but we disagree with the State's characterization of our review. We have not undertaken a granular analysis of each twist and turn as the prosecution prepared its case; instead, we have grouped the case development periods into key stages and asked whether delays that prevented advancement to the next critical stage were beyond the State's control and made it not practicable to proceed before Andy turned 18.

The State failed to prove by a preponderance of the evidence that for reasons beyond its control it was not practicable—i.e., reasonably achievable, feasible—to proceed in juvenile court on this case before Andy's 18th birthday. *See Moore*, 446 S.W.3d at 52 (holding that investigative delay caused by detective's large caseload and mistake as to defendant's age were not reasons beyond State's control when offense was promptly reported, defendant was identified as perpetrator well short of his 17th birthday, and correct birthdate was evident in other police records, and, therefore, dismissing aggravated-sexual-assault charge); *Webb v. State*, No. 08-00-00161-CR, 2001 WL 1326894, at *6–7 (Tex. App.—El Paso, Oct. 25, 2001, pet. ref'd) (mem. op., not designated for publication) (holding that State's failure to notify juvenile court of defendant's upcoming 18th birthday was not reason for delay beyond State's control and therefore dismissing murder charge). The State presented, and the juvenile court made findings based on, a chronology of events, but the State failed to explain the cause of delays for a number of those events. We sustain Andy's single issue.

## Conclusion

Because the State did not meet its burden of proof under Section 54.02, the juvenile court had only one option: to dismiss the case. *See Moore*, 532 S.W.3d at 405 (holding that State's failure to meet burden left juvenile court with no option other than to dismiss case). The statute's amendment reduces the risk that this scenario will recur. But under binding precedent and the earlier version of the statute applicable here, we must vacate the juvenile court's order and dismiss the case for lack of jurisdiction.

Harvey Brown
Justice

Panel consists of Justices Higley, Brown, and Caughey.

31